## Consolidation Coal Company v. Gibbs.

(Decided March 4, 1921.)

### Appeal from Johnson Circuit Court.

1.  Master and Servant—Creation of Relationship.—When an employer retains and exercises the right to direct the manner in which the business shall be done, as well as the result to be accomplished under a contract, it creates the relationship of master and servant.

2.  Contracts—Ambiguity.—In the interpretation of ambiguous and uncertain contracts, which have been executed or partially executed, the courts will generally adopt that construction which the parties themselves in operating under the contract have given to it.

3.  Master and Servant—Creation of Relationship.—Plaintiff's evidence analyzed, and when taken altogether is declared to have

created the relationship of master and servant and not to have made him an independent contractor as claimed.

.E. C. O'REAR, W. G. DEARING, KIRK & KIRK and ALLIE W. YOUNG for appellant.

J. L. HERRINGTON and W. H. VAUGHN & SON for appellee.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Reversing.

The appellee, Gibbs, filed this action against the appellant company, alleging that in January, 1918, he entered into a verbal contract with the defendant through its agent, servant and employe, Queen, whereby the defendant employed him to cut and manufacture into bank props, motor ties and room ties, at certain stipulated prices, all the timber on a certain boundary of land containing about 400 acres, in Johnson county, at or near certain coal mines the defendant was then operating.

He charges that he entered upon a performance of the contract and continued until about the — day of August, 1918, at which time defendant wrongfully, and without right, refused to permit him to complete the same, whereby he was deprived of the additional profit he would have made if he had completed the same, amounting to $2,500.

The defendant answered, denying the existence of the contract.

Upon a trial the jury returned a verdict of one thousand dollars for the plaintiff, upon which judgment was entered, and the defendant has appealed, insisting that it was entitled to a peremptory instruction.

The difficulty in deciding this question grows out of the uncertain, vague and unsatisfactory nature of the plaintiff's own testimony with reference to the terms of the agreement; for if it may be said that his evidence substantiates the allegations of his petition, the directed verdict was properly refused, but if, on the contrary, it proves a contract different from the one alleged, and under the terms of which the right existed by either party to terminate it, then the peremptory should have gone.

Plaintiff's testimony on this subject, on his main examination, was as follows:

"You may state whether or not you entered into a contract with the Consolidation Coal Co. relative to timbering a boundary of land for ties and props for its mine."

(Defendant objects; the court: He may tell what was said).

I was working on the tipple, and had started to dinner at twelve and Queen called me back and said he wanted me to make posts and I told him I would rather not make posts or ties—it was ties instead of posts—and he says, I will give you a contract, and I told him the timber was frozen hard until I could not do any good, and I says, yonder is as good a timber man as there is, and he says, who is it, and I says, Ezra Salyers, and he said he would give me Ezra Salyers for a buddy, so I saw Ezra and he said he would work, and he worked a while and he quit, said it was too far to walk, he could not work, and I went ahead making ties myself and I sawed them up, got them sawed up with the help of Jay Pack, and we were sitting there and I saw Queen coming up, and I says, there is something up the way he is riding, and he rode up—Herb Queen—and says, what about making some posts? and I says, I have nobody to help saw, and he says, what about that fellow you have with you, Pack? and I said he did not want to work in the woods, and Queen says, in case of an emergency he can work any place we want him, and about that time I took the contract of making posts and he gave me these other four hollows.''

Again, on his main examination, he testified, in answer to questions, as follows:

''Was an agreement made for cutting all post timber on this boundary of land at the time the agreement was entered into about cutting the tie timber on the land?''

(Defendant objects; the court overruled the objection, to which defendant excepts.)

Well, we took the contract to make posts just after I got the boundary of ties. I first made ties and then he told me he wanted me to make posts of it.

Was anything said between you and Mr. Queen relative to whether or not you were to cut all of the timber on this boundary of land into cross ties and bank props?

(Defendant objects; the court overruled the objection, to which defendant excepts.)

I was to cut everything but the locust.

Who said that?

Herb Queen.''

Thereafter, in the summer of 1918, a new superintendent of some of the mines, Wolfe, was named, and Gibbs had a conversation with Queen wherein he told Gibbs to

report to Wolfe, and as to that Gibbs, on his main examination, testified as follows:

"When was that with reference to your arrangement with Mr. Herb Queen when you were assigned the four hollows?

"A right smart bit after; I think it must have been the last of June or first of August when Mr. Wolfe came in as general super.

"When you had the conversation with him relative to this contract, you may state where it was and who was present."

(Defendant objects; the court overruled the objection, to which defendant excepts.)

"We were at No. 3 barn and he told me the evening before, Queen did, that I would have to go to Wolfe next morning; that he was general super over me; so me and Jay Pack went up next morning and I asked Mr. Wolfe if he wanted me to go ahead and make ties, and he says, yes, he wanted me to go on and make ties; that he did not want to be any more this winter like they had been.

"State all the conversation between you and Mr. Wolfe relative to this arrangement.

"I went ahead and worked on and got the tie timber about worked out where we could get to for the truck patches and patches of corn where the people had their gardens in, and I went to him and said I was up against it about some ties to make; said the truck patches and patches of corn cut us out, and he says, go ahead and make what you can without destroying the people's stuff and when you get that worked out, I will give you another contract, a bigger one and better one."

Again, in testifying about a conversation between him and Wolfe, he says, on his main examination, that Wolfe told him to get out whatever he could at the place he was working, "and when I got out what I could he would put me in another territory."

Again, he says that Queen told him to work on Possum Hollow "and moved me from there to Sorghum."

He again testified that he said to Wolfe, after Wolfe had become superintendent that "there was one thing I would like to ask of him and I told him Mr. Queen had never allowed me to hire any men, and that I would like to hire some men; that I could not do any good with just my buddy and myself, and he said, you can hire all the men you want. The timber is what we want, and we want the yard stocked."

He testified on cross-examination, that at the time of his first conversation with Queen he was working on the jin crew for the company, and that the members of that crew did all kinds of work, any kind that they were told to do; that Queen first put him to work in Possum Hollow and then afterwards directed him at different times to work in other places; that Queen did not tell him how many ties he wanted, but he said he wanted "some several;" that if they told him to go from one hollow to another, he would go there, and that he worked in first one place and then another as he was directed; that the company had five mines and they went where they were directed to go as the most convenient place to get out timber for the particular mine; that he made ties, and the number of ties where he was told to, and delivered them where he was directed, and quit making them when he was told to quit.

It will be observed from this evidence of the plaintiff that at the beginning he was given only one "hollow" in which to work, and that thereafter, when he was put to making posts, "he gave me those other four hollows;" but he never says in his testimony that he was to have the exclusive contract to take off the tie and post timber from the four hundred acres, but, in response to a flagrantly leading question from his own counsel, to wit:

"Was anything said between you and Mr. Queen relative to whether or not you were to cut all of the timber on this boundary of land into cross ties and bank props?" he answered:

"I was to cut everything but the locust."

The question is, does not this vague, indefinite and evasive statement by the plaintiff of the terms of the contract, when interpreted in connection with the whole of his testimony, show not only that he did not have the contract set out in the petition but that he in fact had a totally different one?

He says that in the first talk with Queen only cross ties were mentioned, and that Queen refused to permit him to have more than one man work with him in the getting out of ties. This refusal of Queen at the very inception of the contract is most convincing that Gibbs was not thereby made an independent contractor, and that he was not then given the contract which he alleges, for if he had been given such contract and had been made an independent contractor, neither Queen nor any other officer of the

company would have had or exercised the right to control him as to the number of men he should put on the job.

Then again, if Gibbs had been an independent contractor he would not, as he has testified he did, have asked Wolfe whether he wanted him to continue to make ties. If he had the contract to take off all the timber he would not have been subject to the orders and directions of the officials of the company as to when and where he should work and how many ties he should get out at certain places and how many men he might or might not work.

Interpreting all this evidence of the plaintiff in connection with his hesitant and vague statements with reference to the terms of the agreement with Queen, it becomes reasonably clear that neither he nor Queen at the time intended to make Gibbs an independent contractor for the purpose of making the timber on the whole 400 acres into ties and props; but that, on the contrary, it was in their minds that appellee was merely being taken from one branch of appellant's service and placed in another branch where he was given a better opportunity to make money, but that his new work was to remain under the orders and directions of appellant's officers.

When an employer retains and exercises the right to direct the manner in which the business shall be done, as well as the result to be accomplished, the contract creates the relationship of master and servant. 26 Cyc. p. 966; 18 R. C. L. 490; Robinson v. Webb, 11 Bush 464.

In the interpretation of ambiguous and uncertain contracts which have been executed, or partially executed, there is no safer plan than to adopt that construction which the parties themselves in operating under the contract have given to it.

Applying these rules to the analysis of the plaintiff's evidence which we have undertaken the plaintiff's own evidence not only fails to establish the contract which he has alleged but, in fact, establishes a different contract which creates the relationship of master and servant, which either party might terminate at any time.

It follows from what we have said that the motion for directed verdict should have been sustained.

The judgment is reversed, with directions to grant appellant a new trial and for further proceedings consistent herewith.