## Bass v. Commonwealth.

(Decided December 14, 1927.)

## Appeal from Hopkins Circuit Court.

1. Embezzlement.—Under Ky. Stats., sec. 1202, punishing any agent of bank or corporation who shall fraudulently convert to own use or use of another any property coming into his possession, employer must have either actual or special title in property converted and suffer technical injury, since agent could not fraudulently convert property of employer to its own use.

2. Embezzlement.—Under Ky. Stats., sec. 1202, punishing any agent of bank or corporation who shall fraudulently convert to own use or use of another any property coming into his possession, agent may convert property of his employer's patrons to use of employer, though employer as bailee had technical title therein; words "use of another" applying to employer.

3. Embezzlement.—Under Ky. Stats., sec. 1202, punishing officer of bank embezzling or fraudulently converting goods to his own use or use of another, any property coming into his possession as officer, indictment charging cashier with embezzling and converting to his own use and to the use of the bank Liberty bonds belonging to another intrusted to care of cashier, held not objectionable as charging conversion of property to use of bank which was properly embraced in the words "use of another."

4. Embezzlement.—Indictment charging bank cashier with embezzling and fraudulently converting property described as "United States Liberty bonds to amount of $2,000.00 par value, . . . property of H. A., intrusted to defendant's care as cashier," further description being unknown to jurors, held to sufficiently identify property and show it to be subject of larceny, though number, denomination, or issue of bonds was not stated.

5. Embezzlement.—Criminal Code of Practice, sec. 135, regulating description of money, currency, and bank notes in indictments for embezzling and fraudulently converting same, does not embrace Liberty bonds.

6. Indictment and Information.—Under indictment charging defendant with embezzling United States Liberty bonds amounting to $2,000, property of H. A., which had been intrusted to defendant's care as cashier of bank, defendant, if unable to determine which of various bonds deposited with him by H. A. were subject to the charge, was entitled to require commonwealth to furnish bill of particulars, and filing of bill of particulars on request, stating that commonwealth was unable to give more particular description of bonds except as to that set forth in receipt executed by defendant, a copy of which was filed as part of bill, sufficiently protected defendant's rights.

7. Embezzlement.—In prosecution of bank cashier under Ky. Stats., sec. 1202, for embezzling and fraudulently converting to his own

use and use of bank Liberty bonds belonging to depositor and intrusted to care of cashier and described in receipt executed by cashier, evidence showing that bonds of depositor were sold before receipt was issued, that no additional bonds were ever purchased by depositor so that bank held no bonds for him, and that receipt referred to bonds of a different issue than owned by depositor, was insufficient to sustain conviction based on embezzlement of bonds described in receipt.

8. Criminal Law.—Under indictment charging bank cashier with embezzling and fraudulently converting bonds delivered to his care and custody, commonwealth can elect on new trial to prosecute for embezzlement of bonds actually delivered to cashier or bonds described in receipt executed by cashier.

9. Embezzlement.—Where bonds were delivered to safe-keeping of bank cashier, sale and conversion of bonds to use of bank without depositor's consent, if fraudulent, would constitute "embezzlement" of such bonds within Ky. Stats., sec. 1202.

10. Embezzlement.—If depositor delivering bonds to bank cashier authorized cashier merely to exchange bonds for new bonds at maturity, sale and conversion of bonds to use of bank, if fraudulent, would constitute embezzlement of such bonds under Ky. Stats., sec. 1202.

11. Embezzlement.—If depositor of bonds with bank cashier authorized cashier to sell bonds and purchase new bonds with proceeds, sale of bonds by cashier would be legal, but proceeds could not be used except in purchase of new bonds, and fraudulent conversion of proceeds of bonds to use of bank would be embezzlement of proceeds, an offense not included in indictment for embezzling and converting bonds delivered to cashier.

12. Embezzlement.—In prosecution of bank cashier under Ky. Stats., sec. 1202, for embezzling and fraudulently converting to his use and use of bank bonds delivered to cashier who was principal stockholder of bank and interested in its dividends and cash resources, proof of 100 per cent. dividend declared by bank as evidence of management and conduct of bank at the time of transactions in dispute was competent to throw light on cashier's purpose.

13. Embezzlement.—In prosecution of bank cashier under Ky. Stats., sec. 1202, for embezzling and fraudulently converting to his use and use of bank, bonds delivered to cashier who was principal stockholder of bank, evidence of increase in book value of bank building to true value was mere matter of bookkeeping and inadmissible as unrelated to bond transactions.

C. J. WADDILL and CHARLES G. FRANKLIN for appellant.

FRANK E. DAUGHERTY, Attorney General, and MOORMAN DITTO, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

Claude Bass was convicted of the crime of embezzlement, and he appeals.   The indictment was drawn under section 1202, Kentucky Statutes, and in these words:

> "The grand jurors of the county of Hopkins county, in the name and by the authority of the commonwealth of Kentucky, accuse Claude Bass of the crime of embezzling to his own use and the use of another United States Liberty Loan bonds committed in manner and form as follows, to-wit: The said Claude Bass in the said county of Hopkins on the ———— day of ————, 1921, and before the finding of this indictment being a servant, to-wit, the cashier of the Farmers' Bank, White Plains, Ky., a banking corporation created by the laws of the state of Kentucky, did, he being then and there the duly elected and acting cashier of said bank, embezzle and fraudulently convert to his own use and the use of the said Farmers' Bank, White Plains, Ky., and the stockholders of the said bank, whose names are to the grand jurors unknown, United States Liberty Loan bonds to the amount of $2,000, par value, a further description of which is to the grand jurors unknown, and which said bonds were then and there the property of one Henry Allen, and which said bonds had theretofore been intrusted to the care and custody of the said Claude Bass, as cashier aforesaid, and by the said Henry Allen, and that said conversion of said bonds by the defendant was for the purpose and with the intent at the time to defraud the said Henry Allen, contrary to the statutes in such cases made and provided and against the peace and dignity of the commonwealth of Kentucky."

The statute reads:

> "If any officer, agent, clerk or servant of any bank or corporation shall embezzle, or fraudulently convert to his own use or the use of another, bullion, money, bank notes, or any effects or property belonging to such bank or corporation, or other corporation or any person, which shall have come to his possession or been placed in his care or under his

management as such officer, agent, clerk or servant, he and the person to whose use the same was fraudulently converted, if he assented thereto, shall be confined in the penitentiary not less than one nor more than ten years.'' Section 1202.

It is urged that the indictment is bad in that it charges the alleged embezzled property to have been *converted to the use of the bank;* the argument being:

''That the statute was directed at officers and servants of a bank or corporation who as such 'fraudulently convert to their own use or the use of another' property intrusted to the bank or corporation which has come to the possession or been placed in the care or under the management of such officer or agent. Neither the language nor purpose of the statute includes the conversion to the use of the bank as 'the use of another' does not embrace the bank's use as within the purview of that section as the bank is regarded as injured rather than a benefited party.''

In support of this construction appellant cites Runyon v. Com., 215 Ky. 689, 286 S. W. 1076, in which it is said:

''In order to sustain a conviction for this offense (under section 1202) it must be alleged and proven that the injured party is either a bank or a corporation.''

Under the facts of that case the employer was the injured party and was so treated in the opinion which followed Morse v. Com., 129 Ky. 294, 111 S. W. 714, 33 Ky. Law Rep. 831, 844, where under similar facts the same thought was expressed in different words, the employer of the accused being treated as synonymous with the injured party. However the language used in those opinions is too narrow for general application.

True, in order to constitute embezzlement under this section, the employer must have either actual or special title in the property converted and presumably suffers a technical injury in the default of its servant or agent. But the statute is made for the protection of both the employer and its patrons. It expressly covers all forms of property ''belonging to such bank or other corporation or any person, of which the accused has possession by

virtue of his agency" and which he "fraudulently converts to his own use or the use of another." Obviously an agent could not fraudulently convert the property of his employer to *its use.* But it is just as obvious that he could so convert the property of his employer's patrons to its use, even though as bailee it had a technical title therein; and in such instances the words "use of another" would clearly apply to the employer's use. Also it must be noted that, as a corporation cannot be prosecuted for a felony, such punishment can only be inflicted on the guilty agent, and it is evident that the Legislature did not use these words as meaning that a servant guilty of embezzlement from a patron should be absolved from punishment where his employer received the profits of the crime, even though it should be technically injured.

2. It is next insisted that the property alleged to have been embezzled is insufficiently described. As to this it will be observed that the property embezzled is described as being "United States Liberty bonds to the amount of $2,000.00 par value. . . . the property of Henry Allen, which had been intrusted to the care and custody of the said Claude Bass as cashier aforesaid by the said Henry Allen," and that a further description was unknown to the grand jurors. Admittedly the provisions of section 135 of the Criminal Code regulating the description of money, currency, and bank notes in indictments of this character does not embrace Liberty bonds, and it is insisted that these are not sufficiently described to be identified. But such is not the case. True the indictment does not refer to the number, denomination, nor issue of the bonds, but it does state the amount and character of the bonds and designates them as the ones intrusted to the care and custody of Claude Bass as cashier, by Henry Allen. This identifies the property, and shows it to be the subject of larceny, and a person of common understanding could not have been misled as to the offense charged. Com. v. Butterick, 100 Mass. 1, 97 Am. Dec. 65. Certainly defendant could not be in doubt as to its purport if he had had but one transaction with Henry Allen. If his transactions with Henry Allen had been so numerous as to render him unable to determine which of the various bonds theretofore deposited with him were the subject of the charge, he might on a proper showing ask the court to require the commonwealth to furnish a bill of particulars. Com. v. Hol-

liday, 166 Ky. 384, 179 S. W. 235. He did file such affidavit, and the commonwealth filed a bill of particulars stating that it was unable to give a more particular description of the bonds except as set forth in a certain receipt executed by the accused, which it copied and filed as a part of the bill. See second receipt, infra. We conclude that the indictment was sufficient and that appellants' rights in this respect were fully protected.

3. The next insistence is that the court erred in failing to peremptorily instruct the jury to find appellant not guilty; and that if there is a scintilla of evidence it is not sufficient to support the verdict. This requires a statement of facts.

It appears that defendant became the cashier of the Farmers' Bank of White Plains about the year 1908, and served as such until the 1st of January, 1924. The capital stock of the bank was $15,000, of which defendant owned $7,900 and his near relatives $4,800. On the 23d of June, 1923, the bank declared a cash dividend of 100 per cent. payable June 30th, defendant receiving his part. In August, 1923, the charter of the bank was renewed with the approval of the state banking commissioner. In August, 1923, defendant moved to Madisonville, and on the 1st of January, 1924, severed his active connection with the bank and in July, 1924, sold his stock. In May, 1925, the state banking department closed the bank, and its liquidation led to this prosecution. It further appears that beginning with the year 1918 the patrons of the bank delivered to it a large amount of Liberty bonds for safe-keeping to be returned on demand and for which the defendant as cashier gave receipts describing the bonds in detail; the one given the prosecuting witness being in these words:

"No. 41868—59948—194585.

"Henry Allen has deposited in this bank $2,000.00 government bonds bearing interest at the rate of 4¼ per cent. The above bonds are left for safe-keeping and are the property of said Henry Allen and are to be delivered to him or his assigns upon return of this receipt. Dated Dec. 24, 1918.
"Farmers' Bank, by H. M."

—the letters "H. M." being the initials of Miss Murphy, an assistant. A register was opened on the books of the

bank showing the names of the bondholders, and describing in detail the character, issue, amount, and number of the bonds. The coupons were clipped regularly from these bonds and paid to the depositors, who could obtain the bonds by signing the register and surrendering their receipt. Later about the year 1920 the bank undertook to open a bonding department. It is claimed that burglar insurance was high, and that it was a convenience to patrons for it to carry these securities as liquid assets whereby a customer could either demand cash or securities. It thereupon opened on its books an emergency account. Upon selling a bond or security of a customer, the amount of the proceeds was charged to the bank on this account, and a notation made on the bank register of the name of the patron and the amount and issue of the bonds desired by him, and he was given a receipt therefor certifying the deposit of a certain amount of Fourth 4¼ Liberty bonds as described on the back of the certificate with the further provision that they were to be returned to the depositor on a return of the certificate properly indorsed. Upon the surrender of this receipt, if the patron requested bonds, the bank would supply him either from bonds it had on hand in the safe or purchase them for him in the open market, or at his option he could demand the face of the receipt in cash and the emergency account was credited thereby. These records of the bank were regularly inspected by the state bank examiners and not questioned by them. When a receipt was given for specific bonds such as the one copied above, the bond was held by the bank, and, when the holder would call for his interest, the coupons would be clipped therefrom. But, when a general receipt was given and the emergency fund had been credited, the holder of such receipt would present it, and the bank would pay him the interest and credit this on the back of his receipt. The prosecuting witness, Henry Allen, was given one of the latter receipts reading as follows:

"Farmers' Bank.

"Interest Due, April and October                No. 13.

"White Plains, Ky., April 16, 1923.

"This certifies that Henry Allen, White Plains, Ky., has deposited with this bank two thousand $2,000.00 Fourth Liberty Bonds. Bonds as described

on the back of this certificate.  The above securities will be returned to the depositor on return of this certificate properly indorsed.

"Farmers' Bank,

"By Claude Bass, Cashier.

"('2')"

Indorsed on the back:

| Issue. | How Many Bonds | Denomination. | Total |
|--------|----------------|---------------|-------|
| Int. Pd. | To Oct. 15, 1923 | $42.50 | |
| Int. Pd. | To Apr. 15, 1924 | $42.50 | |
| Int. Pd. | To Oct. 15, 1924 | $42.50 (WAB) | |
| Int. Pd. | To Oct. 15, 1925 | $42.50 | |

"Receipt is hereby acknowledged of the return of the within described securities.

"(Signed) ———————

"———————, 192—."

It is further claimed that the entire transaction was open and bona fide and fully understood by the patrons of the bank and the banking department and met with their approval; that during the time defendant was with the bank it was at all times solvent, and, as the emergency account was carried as a liability, it did not profit thereby, and no fraud could have been intended.  As to the concrete facts peculiar to this case, Henry Allen testifies that he moved to White Plains in the fall of 1918 and opened a checking account with the White Plains bank; he had $2,000 in Liberty bonds which he desired to retain and intrusted them to this bank for safe-keeping, accepting the receipt No. 1 at the time of their delivery.  Subsequently Mr. Bass tried to buy them for the bank, and he declined to sell them, but called at the bank and received the coupons as they matured.  Later Mr. Bass asked him to exchange receipts, as he desired to pay the interest in April and October instead of May and November as he had been paying it, and he surrendered his first receipt and accepted the second.  He does not remember signing his name on the books of the bank, and does not think the signature on the bond register is in his handwriting.  He never at any time authorized Mr. Bass to sell his bonds or dispose of them in any way, and did not learn that this

had been done until he was so informed by the officials. who were liquidating the bank.

On the other hand, appellant testifies: That the three Allen bonds were interim bonds, which matured in two or three years. That two of these were of the second issue and one of the third. That the latter was exchanged for another of equal amount of the second issue so as to make the interest uniform, this being done on November 29, 1920, the coupons from these were clipped and paid Mr. Allen as they matured. That he discussed the bank's bond plan with Mr. Allen, and he understood and agreed to a sale of his old bonds and for the matter to be carried the way it was. Mr. Allen's bonds were sold some two or three years after the bank received them and the emergency account credited with the proceeds. Appellant does not know the date but there is an entry crediting the emergency fund with $2,000 on April 20, 1921, and this is presumably the time they were sold. Mr. Allen surrendered his old certificate, signed the bond register in three places opposite the entry describing the original bonds, and appellant issued the second certificate and delivered it to him as described supra, and later paid him the interest as it matured semiannually. and indorsed the amounts of interest on his receipts. That after he left the bank this practice was pursued by his successors. The books were introduced in evidence, and the entries on the bond register gives the serial numbers of the original bonds deposited by Mr. Allen; and, under date of April 16, 1923. (the date the new certificate was issued), Mr. Allen's name is signed on the old bond register, and a number of checks bearing his genuine signature are introduced in evidence, and from a comparison with them the signatures on the bond register appear to be genuine.

As to the sufficiency of this evidence to sustain a conviction, it will be noted that the commonwealth by its bill of particulars elected to prosecute appellant for a conversion of the bonds described in receipt No. 2, and appellant strongly argues that this paper is in form a certificate of time deposit authorizing the holder to demand the amount specified in cash, or at his option to demand its value in Fourth Issue 4¼ Liberty bonds. It might be made a receipt for a deposit of specific bonds to be held for safe-keeping by indorsing a description of such bonds on the back of the receipt; but that in the absence of such indorsement it cannot be construed as showing the depos-

itor to be an actual holder of bonds or the bank as being his bailee, and that therefore it cannot be made the basis of a prosecution for embezzlement. The question is not free from doubt, but we do not think a construction of this instrument necessary on this appeal. We have seen that the Allen bonds were sold some time before this receipt was issued and that no additional bonds were ever purchased for him, so that at the time of its issue Allen had no bonds to deliver and the bank was holding none for him, and that receipt refers to bonds of a different issue from those he did own. So that, whether it was fraudulent or bona fide and regardless of its meaning, the appellant could not have converted any bonds referred to as described therein, and for this reason the proof is insufficient to sustain a conviction based on the embezzlement of the bonds described therein, and the judgment must be reversed.

4. However the indictment charges a conversion of the bonds which Allen actually delivered the bank and on a new trial obtained by defendant the commonwealth is at liberty to change its election. McCreary v. Com., 163 Ky. 206, 173 S. W. 351. It is therefore proper to consider whether there is sufficient evidence to submit to the jury the charge in the indictment. Clearly those bonds were delivered for safe-keeping only, and, if without Henry Allen's consent appellant sold and converted them to the use of the bank, this, if fraudulent, would constitute embezzlement of those *bonds*. If at the maturity of those bonds Allen authorized appellant merely to exchange them for new bonds and instead of so doing he fraudulently sold and converted them to the use of the bank, the same principle would apply. If Allen authorized appellant to sell those bonds and purchase new bonds with the proceeds, and he did sell them, the *sale* of the bonds by appellant would be legal, but he could not use the proceeds except in the purchase of new bonds, and, if he did thus sell them and fraudulently convert the proceeds to the use of the bank, this would be an embezzlement of the proceeds of the bonds, an offense not included in the indictment.

We have seen that the proceeds of sale were delivered to the bank; that Mr. Allen positively denies that he agreed to any sale or disposition of his bonds, and asserts that he knew nothing of that transaction until after the liquidation of the bank. His evidence is weakened by the

fact that he surrendered his certificate No. 1, (apparently) signed the bond register and later accepted and retained a receipt for a different issue of bonds to say nothing of the defendant's evidence, but it certainly constitutes a scintilla of evidence that his bonds were either sold without his consent or that he merely assented to an exchange of the interim bonds at maturity, and from these facts, if true, an inference of fraud may be drawn. Upon a proper showing this may authorize a submission of the case on another trial, though for manifest reasons we will not now discuss the sufficiency of the evidence to uphold a verdict. It is strongly argued that the court erred in permitting proof of a 100 per cent. dividend declared by the bank in June, 1923, and also of an entry upon the books of the bank at the time, by which the value of the bank building was increased from $350 to $6,350; it being admitted that the property was of that value at the time. However, inasmuch as appellant was the principal stockholder in the bank and vitally interested in dividends and in its having cash resources on hand at all times, we think it competent to introduce in evidence the management and conduct of the bank at the time of these transactions, so far as it throws any light on appellant's purpose, all of which is open to explanation by him. But, as it appears that the bank building was worth $6,350, though previously carried on the books at the sum of $350, and that the change in book value in 1923, by raising the amount at which it was carried on the books to $6,350, was a mere matter of bookkeeping, proof of this can shed no light on the bond transactions and in another trial will be omitted.

The instructions are criticized, but the errors complained of cannot occur on another trial.

Wherefore the judgment is reversed and cause remanded for proceedings consistent with this opinion.