# George T. Wood, Jr. v. Commonwealth.

(Decided May 14, 1929.)

460

ARTHUR BENSINGER, JAMES P. EDWARDS, TRABUE,
DOOLAN, HELM & HELM and BOOTH & CONNER for appellant.

J. W. CAMMACK, Attorney General, and JAS. M. GILBERT, Assistant Attorney General, for appellee.

·OPINION OF THE COURT BY COMMISSIONER STANLEY—·
Affirming.

The appellant, George T. Wood, Jr., appeals from a judgment sentencing him to serve two years in the penitentiary for violating section 1358a of the Statutes, which provides punishment for "any person who shall . . . dispose of or convert to his or her own use or the use of another, any money, property, or other thing of value without the consent of the owners thereof."

. The indictment charges the appellant and his brother, Richard V. Wood, with conversion of a certain certificate for 20 shares of stock of the Standard Oil Company of Indiana belonging to James A. McGinnis, the "certificate being in the name of Thomson & McKinnon, the same having been duly assigned in blank by the said Thomson & McKinnon, then and there bearing the endorsement in blank and the signature of the said Thomson & McKinnon on the back thereof, when so endorsed and signed the same being then and there of the value of approximately $1,350.00."

■ The appellant contends that the statute under which he was convicted had been repealed by the act which is now incorporated in our statutes as section 1358b. The latter enactment did not have such effect. It merely supplements the first statute. The reasons for this conclusion are given in an opinion this day delivered in the case of the appellant's brother and former part- ·

ner, styled Richard V. Wood v. Commonwealth, 229 Ky. 452, 17 S. W. (2d) 440, to which reference is made.

■ It is further contended that the indictment was demurrable because it charged the defendant with the conversion of a certificate of stock, and such instrument is not property or money or other thing of value; that it is merely the evidence of the ownership of shares of stock in the corporation—not the shares themselves. Strictly and technically speaking, that is correct. Nevertheless, a certificate of stock, indorsed and signed in blank by the one to whom issued, ordinarily passes by delivery the title to the stock it represents. If the certificate has not been indorsed in such a way as to be transferable by delivery, and the signature of the owner was required before a transfer could be effected, there would be much force in the argument.

"Property" is a diversified term, and includes any species of right. See section 732, Civil Code, and Caldwell's Dictionary, title 'Property." Sea v. Conrad, 155 Ky. 51, 159 S. W. 622, 47 L. R. A. (N. S.) 1074, Ann. Cas. 1915C, 318; Raydure v. Board of Supervisors, 183 Ky. 84, 209 S W. 19; Fayette Realty & Finance Co. v. Commonwealth, by, etc., 229 Ky. 556, 17 S. W. (2d) 722 (decided March 22, 1929, not yet [officially] reported). In Brown v. Vancleave, 21 S. W. 756, 14 Ky. Law Rep. 821, it was held that an action can be maintained for the specific recovery of a certificate of stock. See, also, Harvey v. Bank of Marrowbone, 178 Ky. 793, 200 S. W. 28; Will's Adm'r v. Geo. Wiedemann Brewing Co., 171 Ky. 681, 188 S. W. 778, Ann. Cas. 1918E, 62.

In Simpson v. Jersey City Contracting Co., 165 N. Y. 193, 58 N. E. 896, 55 L. R. A. 796, it is said: "The distinctions [between the certificate and the stock] sought to be drawn, are largely, artificial. The truth is that it did have property here, in the common acceptation of the term, as well as in the eye of the law. Certificates of stock are treated by business men as property for all practical purposes. They are sold in the market, and they are transferred as collateral security for loans, and they are used in various ways as property."

In Daggett v. Davis, 53 Mich. 35, 18 N. W. 548, 51 Am. Rep. 91, Chief Justice Cooley thus expressed his views: 'But we see no reason why, if the shares are converted by means of a wrongful use of the certificate, the owner in suing may not count upon the conversion of

either. The shares are the property converted, but the certificate itself is also property; standing as it does as the representative of the shares, and as its conversion may take the shares from the owner, it seems to be as proper to count upon its conversion as upon the conversion of money or any chattel.''

The text in 14 C. J. 479, thus classifies such an instrument: ''It has been said that a certificate of stock, being merely the symbol or paper evidence of the ownership of shares of stock, is not in itself property and has no intrinsic value disconnected from the stock which it represents; but as it undoubtedly has a value in itself as a transferable symbol of property and evidence of the holder's right and title as a stockholder, like a negotiable instrument, it has often been held to be in itself property as representing the stock and so treated for many purposes. The certificate of stock as distinguished from the shares of stock which it represents, is not only property, but is tangible personal property.''

The general classification of a certificate of stock was expressed in Sargeant v. Whitfield & Co., 226 Ky. 754, 11 S. W. (2d) 926, without extension. But that was a civil action for the recovery of the value of stock from holders with notice.

We are of the opinion that a certificate of stock as the evidence of ownership or symbol of property comes within the definition of ''property'' used in this statute, and may be the subject of embezzlement and conversion under the statute. Bass v. Commonwealth, 222 Ky. 310, 300 S. W. 866; People v. Williams, 60 Cal. 1. But we are not restricted to that classification in testing the indictment, for undoubtedly a certificate of stock indorsed in blank is included in the comprehensive term ''other thing of value,'' used in the statute.

The particular certificate involved and described in this indictment was a ''thing of value,'' costing McGinnis $1,338.50. He paid appellant and his partner that much money for it. It had value sufficient to enable appellant's firm to secure in part credit for $2,500 at their bank and with their brokerage correspondent. As the evidence disclosed, McGinnis lost nearly $1,350 by reason of being deprived of this certificate, and it would be hard to convince him that it was not a thing of value. We do not make these references to bring the evidence to bear in testing the indictment, but merely by way of illustra-

tion or suggestion that a certificate of stock thus described is a "thing of value." It would be hypertechnical, indeed, to hold that the stock certificate described was not the subject of embezzlement nor contained within the purview of the statute.

The indictment sufficiently and properly accused the defendant with the commission of a crime, and the court did not err in overruling the demurrer to it.

■ Counsel for appellant forcefully argue that the evidence introduced in the case did not prove appellant guilty. Counsel for appellee with equal ability present the converse argument. The appellant and his brother, Richard V. Wood, and Robert B. McDowell composed the partnership of George T. Wood & Son, engaged in the stock and bond brokerage business in the city of Louisville. McDowell's interest was very limited. By the terms of the partnership agreement he had no right to inspect the books of the firm, and was otherwise restricted in his relations. He simply had a drawing account as a salary, and was entitled to a limited share in the profits as additional compensation for his services as a salesman. It may well be doubted whether he was a real partner. See 20 R. C. L. 823, et seq.; 3 R. C. L. Supplement, 1104; 4 R. C. L. Supplement, 1379; and Stephens v. Neely, 161 Ark. 114, 255 S. W. 562, 45 A. L. R. 1236. The Wood brothers owned, controlled, and dominated the firm, and personally conducted its business.

The evidence shows that James A. McGinnis, a resident of Lawrenceburg, Ky., some time in April, 1927, in a long-distance telephone conversation with appellant, George T. Wood, Jr., authorized the purchase for his account of 20 shares of stock of the Standard Oil Company of Indiana at $66.75 a share. McGinnis received confirmation of the purchase, and promptly on April 21st sent his check for $1,338.50, payable to George T. Wood & Son. On the 22d, acknowledgment was made of the receipt of remittance in payment of the stock. This letter bore the initials "R. V. W." apparently being dictated by appellant's brother. Having heard nothing more from his remittance, and not having received the certificate of stock, on June 14th McGinnis called appellant by telephone with reference to it, and afterwards received a letter written by the appellant advising him that "through an oversight the 20 shares of Indiana in

question had not been ordered out," and stating that it had that day been ordered out, and would be forwarded within the next two days. On June 15th, with a letter written by appellant, certificate No. E-59121 for 20 shares of stock in the Standard Oil Company of Indiana, standing the name of Thomson & McKinnon, New York correspondents of appellant's firm, was sent to McGinnis. In this letter appellant wrote: "If you wish this stock placed in your name we will be pleased to affect (sic) the transfer if you will return the stock to us." On June 16th he returned the certificate by registered mail to George T. Wood & Son. The postal return receipt, dated June 17th, is signed "George T. Wood & Son," with the name of the addressee's agent so signing it, "Bettie Bell." That was the last McGinnis ever heard from his stock, although he says he afterward wrote Wood & Son, but received no answer. He testified that he did not authorize or give his consent to the appellant or any one else to use the certificate for their own needs.

The record is silent as to what was immediately done with the certificate when it reached appellant's office. Miss Bell was the clerk in that office. As to what she did with it does not appear. The jury no doubt wondered why she did not testify. Henry J. Lynch, bookkeeper and chief factotum of the concern (who appears in the light of a reluctant witness, hostile to the commonwealth), testified he found the certificate and some other securities in a basket on his desk, and, in accordance with his usual practice, without any suggestion from the defendant or his brother, he prepared a draft for $2,500 on Thomson & McKinnon, and attached this certificate and other securities to it as collateral. This draft was signed by Richard V. Wood, and the witness took it to the bank for deposit. The amount of the draft was promptly placed to the credit of George T. Wood & Son. It appears that in due course the securities thus attached to the draft were credited to the firm's account by Thomson & McKinnon. That was the last heard of it.

Lynch testified unequivocally that the defendant, George T. Wood, Jr., had nothing whatever to do with the transaction, and that he was but pursuing a practice followed for several years. This practice was, of course, known to the appellant. Lynch stated that it was his custom and duty thus to send all securities to New York, regardless of the purpose for which they had been deliv-

ered to Wood & Son—whether in marginal transactions or otherwise. Such securities, upon receipt, were placed to the credit of the general account of Wood & Son. Their customers and business connections were unknown to Thomas & McKinnon. The final use or disposition was controlled by wire or "order out slips."

On July 25, 1927, five weeks after the stock certificate was thus disposed of, the firm of George T. Wood & Son collapsed; their liabilities exceeding their assets by approximately $850,000. Of this loss about $750,000 arose from private trading losses of the defendant, George T. Wood, Jr., and his brother, Richard V. Wood. The accounts were not carried on the books of the firm in their own names, but under three fictitious captions or assumed names, and without any sort of individual margin deposits. That these members of the firm were thus trading was concealed from their associate and partner, McDowell, the clerks in the office, and everyone else except Lynch. When the firm failed, the securities deposited to their account with Thomson & McKinnon saved the latter from loss. The owners of the securities were the ones who suffered the loss.

Counsel vigorously maintain that the facts established are as consistent with appellant's innocence as with his guilt; that the evidence is not of sufficient probative value to create a suspicion of guilt; that the whole transaction was in accordance with the usual custom and practice, not only of this firm but of other brokerage establishments, and no fraudulent or criminal intent attached; that the appellant is not shown to have had any knowledge of the return of the certificate by McGinnis, or identified in any way with the conversion of the certificate, if it be considered a criminal conversion.

It may here be observed that the hypothecation by brokers of securities deposited by customers as collateral in marginal transactions appears to be a lawful and established practice. Sargent v. Whitfield, supra. In marginal transactions the relation between customer and broker is virtually that of debtor and creditor, and in the confirmation form sent McGinnis appears this clause: "It is agreed by the broker and customer . . . that all securities from time to time carried in the customer's marginal account or deposited to protect the same may be loaned by the broker or may be pledged by him either separately or together with other securities, either for

the sum due therefor or a greater sum, all without notice to the customer." But there was no such provision as to securities purchased outright. A different relation exists in a transaction of this kind. The broker is merely an agent of the customer. When stock is thus purchased, the whole title is in the customer.

McGinnis paid the brokers in full for the stock as well as the commission for their services. They accepted his money and remained silent. After two months' delay, upon demand, a certificate in the name of strangers was sent to him, accompanied by an apology, not founded on fact, and with the advice that a certificate in his own name would be delivered in exchange, if it were returned. It was returned, and, instead of being thus exchanged, it was converted to the use of the partnership firm, and became again a pledge securing in part their individual trading account. There is no difficulty in determining that there was a criminal conversion. If there was such a practice of appellant's firm in transactions of this kind —as it appears there was—it can hardly be said that the habit of violating the law excuses the commission of any one criminal act.

The difficulty of the case lies in determining whether the evidence was sufficient to identify this particular defendant with that conversion.

There is a twilight zone between suspicion and reasonable inference or a scintilla of evidence. The difficulty is to discern the line of demarcation. Certainly no fixed, specific rule for determining it can be laid down, for no two cases are alike. As each state of acts is presented, the court, in the exercise of its best judgment, and guided by precedent, must measure the evidence and decide in that particular case whether it rises above the mere creation of suspicion and places the facts in the zone of probative evidence and reasonable inference. The abstract criterion in matters of this kind is thus expressed in Combs v. Commonwealth, 224 Ky. 653, 6 S. W. (2d) 1082: "It is our duty to give the evidence the construction most favorable to the Commonwealth of which it is reasonably susceptible, and, when that is done, if it tends to prove the guilt of the defendant, the case should be submitted to the jury."

With that rule in mind, we approach the analysis of the evidence, as it pertains to appellant's individual guilt.

It may be said that there was ample proof of motive on the part of this defendant to commit the offense, for his firm was on the brink of ruin and failure to the extent of nearly a million dollars, due, in the major part, to his own speculation. He and his brother had secured McGinnis' money in April and delivered nothing for it until called upon, and then appellant stated that the delay was due to an oversight; whereas the proof shows, as developed by appellant's counsel on cross-examination of Lynch, that it was the custom of the firm not to deliver securities, unless specifically called for. Excepting the acknowledgment of the remittance, the appellant personally conducted the entire transaction with McGinnis. It was he who wrote McGinnis in response to the telephone conversation suggesting that, if the certificate should be returned, he would have it transferred to McGinnis' name. It is not an unreasonable inference that, when the certificate was returned, it was placed in the hands of appellant as the one who was handling the item of business. If not, then, being aware of the practice of his firm in hypothecating securities of their customers, he knew that, when this certificate was returned, it would be thus placed to the credit of his firm's account, unless he directed otherwise.

As declared in Prater v. Commonwealth, 4 Ky. Law Rep. 344, a principal is often liable for the violation of the criminal law by an agent. That liability arises (1) where the agent acts directly under the principal's commands, or (2) where the agent, although without specific instruction, is acting at the time within the scope of his employment, or (3) where the act is done for the defendant by his knowledge and consent. Under that doctrine the defendant is clearly shown to be guilty, even though he did not personally and specifically direct the conversion of the property. For a compilation of authorities on the subject of criminal liability of a master or principal for acts of his servant or agent, see notes to 41 L. R. A. 650, and 43 L. R. A. (N. S.) 1.

The court has never departed from the established law that one may not be convicted on mere suspicion of guilt, and, where the circumstances are as consistent with innocence as with guilt, a reversal of the judgment will be granted by this court. We have been equally careful, however, to refrain from usurping the functions of the jury, for this court is not called upon to determine the

guilt or innocence of the accused. Trial by jury was established for the protection and benefit of the accused and not of the prosecutor. The law safeguards his rights from the initiation of the prosecution to the execution of the judgment, casting the burdens throughout the procedure on the commonwealth. If the defendant had been deprived of a trial by a jury, he undoubtedly would have just cause to complain. But, having been thus tried, and the result being adverse to him, his appeal for relief must rest upon a substantial and prejudicial error of law. It is the court's imperative duty to affirm the judgment and permit the enforcement of the verdict of the jury, unless it is made to appear that there was a prejudicial error committed during the progress of the proceedings, or that the verdict resulted from some extraneous influence, perhaps not disclosed by the record, such as passion or prejudice on the part of the triers of fact. If there is not sufficient evidence in law to sustain the verdict, it becomes apparent that the jury was influenced by something other than evidence in the case. That is the philosophy underlying the power granted this court to set aside the verdict on the ground that it is contrary to the evidence. It is deemed contrary to the evidence only when it is so patently against the truth of the matter as to shock the conscience and sense of justice. McCurry v. Commonwealth, 205 Ky. 211, 265 S. W. 630; Deaton v. Commonwealth, 211 Ky. 651, 277 S. W. 1001; Oldham v. Commonwealth, 228 Ky. 307, 14 S. W. (2d) 1065. Several declarations of the court in this regard are quoted in Roberson, sec. 1881.

When we draw from the evidence every incriminating inference that a reasonable interpretation will permit, we are constrained to hold the quantum of proof sufficient to sustain the verdict.

■ Complaint is made of the admission of evidence respecting the trading accounts of appellant and his brother under fictitious names and the concealment thereof, as well as evidence of the fact that the firm subsequently failed for a large sum. It is often impossible to prove knowledge, motive, or intent by direct evidence, but such elements may be gathered from the conduct of the party, and any action having a rational relation and a tendency to establish them is competent, notwithstanding it may be incompetent for any other purpose. Any indicatory testimony of an interest in the perpetration

of a crime by reason of advantages accruing to a defendant is competent. In Roberson's Criminal Law, secs. 1880 and 1893, may be found statements of this rule of evidence as compiled from opinions of this court.

In Bass v. Commonwealth, 222 Ky. 310, 300 S. W. 866, a cashier of a bank was convicted under the provisions of section 1202 of the Statutes of embezzling a United States Liberty bond, left with the bank for safe-keeping. The method of handling such securities by the bank is not altogether different from that pursued by the defendant's firm. The bank was forced into liquidation, and, in response to the contention of error in admitting evidence that it had declared 100 per cent. dividend a short time before, the court said:

> "However, inasmuch as appellant was the principal stockholder in the bank and vitally interested in dividends and in its having cash resources on hand at all times, we think it competent to introduce in evidence the management and conduct of the bank at the time of these transactions, so far as it throws any light on appellant's purpose, all of which is open to explanation by him."

But it is also insisted that it was error to admit the evidence because it related to conditions existing 38 days after the transaction from which this prosecution arises, and that presumptions do not run backward. Accurately speaking, the status of affairs when the firm closed its doors and ceased business became the basis of an inference and not a presumption that its insolvency then existed, and that the members individually were about to suffer great loss when the stock was converted. The general rule with respect to presumptions is as submitted by the appellant, but there are exceptions to the rule, such, for instance, where the present condition is one that would not ordinarily exist unless it had also existed at the time as to which the presumption is invoked. 22 C. J. 92. The rule of presumptive or inferential evidence must always be administered along with the rule of reason. Had the shortage been of a small amount, or had the intervening period been of long duration, there would be logical grounds for appellant's contention. But, the facts considered, we think the evidence furnished grounds for, and that there was indeed a prima facie, presumption or a reasonable inference of the existence

of loss in the trading accounts and insolvency of the firm on the date of the transaction. This it was not attempted to overcome. See Wigmore on Evidence, sec. 437. The evidence was competent.

■ It is further suggested in behalf of appellant that, if the evidence as to these collateral things was properly admitted, the court committed a prejudicial error in failing to admonish the jury as to its purpose; reliance being had on Kirby v. Commonwealth, 206 Ky. 535, 267 S. W. 1094, in which the duty of a trial court in this respect is pointed out. The evidence referred to in that case was of a distinct crime. By no means is it in every instance prejudicial error to fail to admonish the jury as to the purpose of admitting collateral evidence. The evidence in the case before us did not relate to any separate crime or to facts involving abstract criminality. but merely to the status of the defendant's financial affairs and his manner of doing business. As men of intelligence, the jury knew they were not trying the defendant for the failure of his firm or for having carried his personal trading account under assumed names. The failure to admonish the jury, assuming it to have been proper, was not prejudicial.

■ Among other objections raised to the admission of evidence is that relating to the testimony of Lynch, the bookkeeper, as to the insolvency of the firm and the losses in the appellant's accounts; it being asserted that the books of the firm constitute the best evidence. Lynch was testifying from his own personal knowledge of facts with which he was familiar, and was not undertaking to testify as to the contents of the books. We do not regard the method of introducing that evidence improper. Underhill's Criminal Evidence, sec. 98; Medlock v. Commonwealth, 215 Ky. 498, 285 S. W. 232.

■ We have given careful consideration to the claims of error in the instructions, but the court is of the opinion that they fairly covered the case, and no prejudicial error appears in them. Nor do we find any merit in the contention as to the misconduct of the commonwealth's attorney in his closing argument.

The defendant has had a fair trial, and the judgment must be, and is, affirmed.

Whole court sitting.

Judge Logan dissents.