## Bass v. Commonwealth.

(Decided January 21, 1930.)

C. J. WADDILL and CHAS. G. FRANKLIN for appellant.

J. W. CAMMACK, Attorney General, and JAMES M. GILBERT, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER STANLEY—
Reversing.

The appellant, Claude Bass, is the same as in Bass
v. Commonwealth, 222 Ky. 310, 300 S. W. 866.   As shown
in that opinion, he was formerly cashier and principal
stockholder of the Farmers' Bank of White Plains, in
Hopkins county, which was closed by the banking depart-
ment of the state in May, 1925, because of its insolvency.
The appellant had not had active management of the bank
since August, 1923, although he was its cashier until Jan-
uary 8, 1924, and president until July, 1924, when he dis-
posed of all his stock.   The case of Farmers' Bank v.
Bailey, 221 Ky. 55, 297 S. W. 938, in which the trans-
actions involved in this appeal were considered as affect-
ing civil rights of Dr. W. B. Bailey, the prosecuting wit-
ness, and other owners of securities deposited with this
bank, will also be found of interest.

The appellant's relation to the bank, its method of
transacting business with respect to securities deposited
by its customers, and the indictment, appear in the other
opinion; the only difference being, so far as the indict-
ment is concerned, in the name of the depositor and the
description of securities charged to have been embezzled.
It is charged in this case that the appellant fraudulently
converted to his own use and the use of the bank $4,250 of
Liberty bonds, the property of Dr. W. B. Bailey.   He was
found guilty and sentenced to three years in prison.
There is very little contradiction in the evidence, except
the mere statement of the owner that he did not authorize
Bass to dispose of his bonds as they were disposed of.

The appellant urges a reversal of the judgment on
the ground that he was entitled to a directed verdict of
acquittal because of the absence of any criminal intent;
that he was innocently carrying out a plan of doing busi-
ness by the bank which was known to and acquiesced in
by the prosecuting witness.   However, if not entitled to
a peremptory instruction, then he insists that the verdict
is palpably against the evidence.   It is also contended
that the instructions were erroneous in several particu-
lars, and that incompetent evidence was admitted.   These
things, coupled with a prejudicial and unfair argument by
the commonwealth's attorney, he says brought about his
conviction.

1.   The evidence heard on the trial, as testified by
witnesses introduced for the prosecution, is, in substance,

this: Dr. Bailey, a regular customer of the bank, had acquired from time to time a number of Liberty bonds which he had left with the bank for safekeeping. On April 13, 1922, he surrendered several receipts previously given, and there was given him a receipt signed by the appellant, as cashier of the Farmers' Bank, showing that it had received $4,250 in Liberty bonds "for safe-keeping." It was the practice of Dr. Bailey to come to the bank, and either he or Bass would clip the coupons from his bonds and deposit the proceeds to his credit. Back in 1920, the bank had created what it termed a "Bonding Department." The manner of handling securities left with it is detailed in the former case. Dr. Bailey testified that, when he went to the bank to clip his coupons in 1923, Bass asked for his receipt, and he inquired, "Where are the bonds?" and Bass replied, "They are in Louisville for safe-keeping." At that time there was issued and given Dr. Bailey the following receipt:

"Farmers' Bank.

"White Plains, Ky., April 13th, 1923.

"Interest Due May and Nov.

"This certifies that Dr. W. B. Bailey, White Plains, Ky., has deposited $3,000.00 Second 4¼ Liberty Bonds. Bonds as described on the back of this Certificate.

"The above securities will be returned on return of this Certificate properly endorsed.
"Farmers' Bank
"By Claude Bass, Cashier."

And a similar one for $1,250 for Fourth Liberty bonds was given him. No description was given on the back of the certificates. Dr. Bailey surrendered to the bank the receipt given him on April 13, 1922. Thereafter Dr. Bailey would take the certificate to the bank as the interest matured, and it was credited on the back of it.

It appears that Dr. Bailey, in addition to the bonds above described, had deposited in a similar manner $1,500 in bonds and had surrendered his receipt therefor and signed the bond register. He continued the practice of having his interest credited on the certificate after Bass had gone out of the bank and up to the time of its failure. The prosecuting witness and his brother, as partners, owned stock in the bank, and his brother was

president at the time of the failure. His nephew and niece were employed in the bank, and he had his office across the street from it, and was very frequently in there. He admits that he had purchased and sold through the bank quite a number of stocks and bonds, some of which were entered on the bond register of the bank, which he signed when he withdrew them. Dr. Bailey testified that he had no knowledge of his bonds having been disposed of by the bank until after its close. He received from the banking commissioner $500 of his bonds which were in the vault at that time. In the case of Farmers' Bank v. Bailey, supra, it was decided that he and other bondholders similarly situated were to be preferred in the distribution of the assets of the bank. He merely says that the bonds were not returned to him, and, for aught that appears in this record, he may have been paid in full for them.

It is shown that after Dr. Bailey received the certificate of April 13, 1923, his bonds were sold, and the proceeds credited to what was styled on the books as "Emergency Account." His interest in that account was shown by the bond register. These books were kept regularly and open to the bank examiners and others having authority to see them. The account was a liability of the bank similar to an individual depositor's account. At the close it practically tallied with the bond register, according to the testimony of the banking commissioner.

There is no evidence that the appellant personally profited by this transaction, except perhaps as a stockholder in the bank for about a year thereafter. The only benefit or profit which the bank secured was the availability of funds to lend at a higher rate of interest than that which the securities bore, and this profit, if any, added to the earnings of the bank. As is disclosed in the former opinion, while the appellant was cashier and principal stockholder in June, 1923, the bank declared a 100 per cent dividend payable in 12 and 24 months, and evidenced by certificates of payment. It is shown by the expert accountant, Sam W. Eskew, representing the banking department, that the condition of the bank at the time justified this dividend. After the appellant retired, the new owners and managers declared a 10 per cent dividend in December, 1924. When the bank closed, the cashier, Wilkie, was indebted to the bank in the sum of

$10,000. He was obligated as an indorser for $4,000 more, and a former president (who succeeded Bass and preceded appellant's brother), was indebted in the sum of $3,800. His brother-in-law owed $2,750. The capital stock was only $15,000. It appears that only $900 was recovered on all of these obligations aggregating $20,550.

It is strongly urged upon us that the transaction by appellant, as shown by the commonwealth, was open and bona fide and fully understood and acquiesced in, not only by Dr. Bailey, but by other patrons of the bank, and met with the approval of the banking department of the state; that there was not a scintilla of evidence showing any criminal conversion authorizing the submission of the case to the jury. Such was the claim also in the former case. The judgment in that case was reversed because of fatal variance between the charge and proof, but it was said that, if Bass without authority made a sale or other disposition of Allen's bonds (described in the indictment and bill of particulars) and fraudulently converted the proceeds to the use of the bank, it would be embezzlement within the scope of the statute under which he was indicted. Dr. Bailey testified positively that he never authorized the disposition of his bonds which was made. While no doubt intended to be and was in part a statement of fact, it necessarily includes a conclusion of law. The facts admitted by him and his conduct almost if not altogether contradict his statement that he did not authorize such disposition. In Duvall v. Commonwealth, 198 Ky. 609, 249 S. W. 768, a witness had testified on direct examination to one thing, but on cross-examination stated that he did not know whether it was so or not, and it was held that the last statement should be taken as a withdrawal of his former one, and, when that statement was withdrawn, the commonwealth had no evidence that the offense had been committed according to the charge in the indictment.

These bonds were treated as special deposits in the nature of time deposits of money bearing interest at the rate provided in the bonds. The receipt given Dr. Bailey in April 13, 1923, was treated by him and by the bank as a form of certificate of deposit usually given that class of customers. The unauthorized act, if it was unauthorized, consisted in transmuting the bond into cash and substituting the bank as obligor instead of the United States government. Did the certificate authorize a sale of the

bonds and replacement upon demand in kind or payment in cash, and did its acceptance show an acquiescence by Dr. Bailey? As stated on the former opinion, the question is not free from doubt, but we hardly think that such construction can be given the instrument itself. It certified that the owner had deposited with the bank the described securities, which would be returned to the depositor on return of the certificate properly indorsed.

While the evidence of appellant's guilt is scanty, the court concludes that, if true, an inference of fraud might be drawn therefrom. It is said in Morse v. Commonwealth, 129 Ky. 294, 111 S. W. 714, 717: "It is not indispensable that the commonwealth should introduce evidence to show a guilty intent before a conviction can be secured for embezzlement. An evil intent is a necessary ingredient in the commission of arson, burglary, larceny, murder, and almost every other felony, including embezzlement, and must be charged in the indictment; but the law will imply the intent from the acts of the accused when they are sufficient to establish his guilt, and this upon the ground that every accountable person is responsible for the consequences that flow from his acts. Snapp v. Com., 82 Ky. 173 (6 Ky. Law Rep. 34)."

And in Wood v. Commonwealth, 229 Ky. 459, 17 S. W. (2d) 443, 446: "The abstract criterion in matters of this kind is thus expressed in Combs v. Commonwealth, 224 Ky. 653, 6 S. W. (2d) 1082: 'It is our duty to give the evidence the construction most favorable to the Commonwealth of which it is reasonably susceptible, and, when that is done, if it tends to prove the guilt of the defendant, the case should be submitted to the jury.' "

The foregoing is the case as it stood when the Commonwealth closed.

2. The appellant testified to Dr. Bailey's and his own relation with the bank, its plan of operation as detailed above, and was emphatic in his testimony that Dr. Bailey was familiar with the method of handling securities; that he knew of the existence of the bond register, having signed it on several occasions when he obtained a return of stocks and bonds, a number of which were bought and sold for him by the bank. These transactions were disclosed by the records produced upon the trial. The $1,500 lot of Liberty bonds referred to by Dr. Bailey were left with the bank on August 23, 1923, and he was given a certificate similar to that covering the

bonds involved in this prosecution. He withdrew those bonds by surrendering the certificate on December 4, 1923, but did not receive the identical bonds left with the bank. They were taken from securities kept for the purpose of redeeming these certificates in kind when demanded. The defendant further testified he told Dr. Bailey his bonds would be sold, and that he clearly understood that this method was to be pursued when he left the $4,250 in bonds with the bank. He denies ever having told Dr. Bailey that his bonds were in Louisville for safe-keeping. The only suggestion made by the banking department of the state regarding this method of doing business was that it would be better if the account should be carried on the general ledger instead of the individual ledger. When this so-called bonding department was opened, Dr. Bailey was a stockholder and approved of it. After his partner and brother became president, it was continued. He testified that the same plan was used by other banks, and that he got the idea from a bank in Louisville. When the dividend of 100 per cent was declared in 1923, Dr. Bailey as a stockholder received his proportion. After its payment, there was over $5,000 left in the surplus account. The only denial of all this evidence is the mere statement of the prosecuting witness that Bass did not tell him that his bonds would be sold and that he did not know of the method being followed. Not only the bonds, but the interest credited on Dr. Bailey's certificate, were regularly shown on the books. The fact that his interest was not credited to his deposit account, but became an obligation of the bank, evidenced by the indorsement, is persuasive that Dr. Bailey knew of the method of handling his bonds and acquiesced therein. So far as the record discloses, he made no inquiry as to this change in method.

The inference of fraud is seemingly rebutted by the inference of good faith manifested by the records, without concealment or effort to conceal, and the assurance of acquiescence by the conduct of Dr. Bailey. It is not shown in this record that, at the time Bass severed his connection with the bank, Dr. Bailey could not have secured satisfaction or a return in kind of bonds deposited by him, and, as indicated, it is not shown that Dr. Bailey was not in fact paid for his bonds in the distribution of the assets of the defunct bank. This is one of those rare cases where the court concludes the verdict is

palpably against the evidence within the meaning of that term as often expressed. See Wood v. Commonwealth, 229 Ky. 459, 17 S. W. (2d) 443.

3. Instruction No. 1 was erroneous, in that it authorized conviction if the jury believed from the evidence beyond a reasonable doubt the defendant converted the bonds either to his own use and benefit, or to the use and benefit of the bank. There was no evidence of any conversion to the defendant's individual benefit, and this should have been omitted. But the instruction should have authorized conviction not only if the bonds themselves, but the proceeds thereof, had been converted.

Instruction No. 2 advised the jury that they should find the defendant not guilty if they believed from the evidence that, at the time the bonds were sold by him, Dr. Bailey knew of the sale or consented thereto, or if, after they were disposed of (if they were), he learned of the sale and consented to it or ratified it, or that the proceeds were with his knowledge and consent deposited to the credit of the account called "Emergency Fund." We think the instruction should have gone further and included the idea that, if Dr. Bailey knew of and acquiesced in the method of handling securities when certificates such as that given him were issued to customers, the defendant was entitled to an acquittal. As before stated, the construction to be given the certificate is not free from doubt. Not being clear, subsequent acts of the parties in relation to the contract may be considered in determining their intentions when making it. Morris Shoe Co. v. Coleman, 187 Ky. 837, 221 S. W. 242.

In Consolidation Coal Co. v. Gibbs, 190 Ky. 717, 228 S. W. 416, 418, it is said:

"In the interpretation of ambiguous and uncertain contracts which have been executed, or partially executed, there is no safer plan than to adopt that construction which the parties themselves in operating under the contract have given to it."

And in Easter v. Johnson, 217 Ky. 639, 290 S. W. 505, it was held that the conduct of a son, after having given his mother power of attorney to sell, lease, or mortgage his interest in land, in making no inquiry about the title and asserting no claim to the land for many years after the death of his mother, showed an intention on his part to grant power to convey land as she had conveyed

it. So may the attitude of the prosecuting witness with respect to this transaction perhaps prove his intention to permit the handling of the bonds in the manner stated. Embezzlement is a breach of trust; but not every breach of trust is embezzlement. Criminal intent is the distinguishing characteristic. Roberson's Criminal Law, sec. 914. The claim of the defendant was that he acted in good faith and as a matter of right. But this defense was not submitted to the jury.

In Dunavant v. Commonwealth, 144 Ky. 210, 137 S. W. 1051, 1052, an embezzlement case, the defendant claimed the right under a contract to use the funds intrusted to him, and in the course of the opinion it was said:

"If the contract was as testified to by Dunavant, or if he in good faith believed that it was as he related it, he was not guilty of wrongdoing under the statute. There must be a fraudulent conversion to constitute the offense, and if Dunavant had or in good faith believed he had the right to retain and appropriate to his own use the money he was charged in the indictment with the conversion of, the statute was not violated."

The kind of instruction to be given on another trial is outlined in the opinion. One of a similar kind should be given in this case in the event of another trial.

4. The argument of the commonwealth's attorney was in some particulars abusive and in others hardly supported by the evidence; and, because of the closeness of the case, it undoubtedly influenced the jury improperly. Caution should be exercised on another trial in this respect.

The judgment is reversed.