STATE, RESPONDENT, *v.* LETTERMAN, APPELLANT.

(No. 6,691.)

(Submitted October 1, 1930. Decided October 16, 1930.)

[292 Pac. 717.]

*Mr. Charles D. Donnelly* and *Mr. T. J. Davis*, for Appellant, submitted a brief; *Mr. Davis* argued the cause orally.

*Mr. L. A. Foot*, Attorney General, *Mr. S. R. Foot*, Assistant Attorney General, *Mr. Frank E. Blair*, County Attorney of Madison County, and *Mr. George R. Allen*, for the State, submitted a brief; *Mr. Blair* and *Mr. Allen* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

The county attorney of Madison county by an information, the sufficiency of which is not challenged, charged the defendant with the commission of grand larceny.

Upon his arraignment the defendant pleaded not guilty. Trial followed. At the close of the state's case the defendant

246

moved the court for an order directing the jury to bring in a verdict of not guilty. The motion was overruled. Thereupon the defendant testified in his own behalf. At the close of the evidence he again moved the court for a directed verdict, with like result.

The court instructed the jury, without objection from either party, that by the information filed in the cause the defendant stood charged with the crime of grand larceny alleged to have been committed by the defendant at the county of Madison, state of Montana, on or about the twenty-sixth day of October, 1929, in that the defendant then and there being agent of and president of the Wilmont-Madison Company, a corporation, and having then and there in his possession, custody and control as such agent and president certain personal property, to-wit, 118,750 shares of the capital stock of the Wilmont-Madison Company, a corporation, the property of and belonging to the corporation, of the value of more than $50, "did then and there wilfully, unlawfully and feloniously, steal, take, convert and appropriate to his own use the said personal property, the property of the said Wilmont-Madison Company, a corporation, with the intent to deprive and defraud the said Wilmont-Madison Company, a corporation, of the use and benefit of the said shares of capital stock of said corporation, belonging to and owned by said corporation.''

That every person who with the intent to deprive or defraud the true owner of his property or of the use and benefit thereof, or to appropriate the same to the use of the taker, having in his possession, custody or control as agent of any corporation any property or article of value of any nature, appropriates the same to his own use, steals such property and is guilty of larceny.

That every person who in another state steals the property of another and brings the same into the state of Montana may be convicted and punished in the same manner as if such larceny had been committed in this state.

That upon an information for larceny it is a sufficient defense that the property was appropriated openly and avowedly

under a claim of title preferred in good faith, even though such claim is untenable.

That in order to find the defendant guilty of the crime of grand larceny as charged in the information, the jury must be satisfied from the evidence, beyond a reasonable doubt, that the defendant did, while having in his possession, custody or control as the fiscal agent of the Wilmont-Madison Company, a corporation, the stock or some portion thereof which he is charged with having feloniously appropriated to his own use, actually appropriate said stock or some portion thereof to his own use, and that at the time of such appropriation it was done with the intent to deprive or defraud the corporation of its property, or of the use or benefit thereof, and unless the jury were so satisfied, they should acquit the defendant. Other instructions need not be noticed.

The jury found the defendant guilty as charged. He moved for a new trial, which was denied. He then appealed to this court from the judgment; there is no appeal from the order denying the motion for a new trial.

While there are eight specifications of error, the argument in behalf of defendant proceeds upon the theory that the evidence is insufficient to support the verdict. Our inquiry is limited to the question whether, the appeal being from the judgment only, there is any substantial evidence to sustain the verdict. (*State* v. *Brantingham,* 66 Mont. 1, 212 Pac. 499; *State* v. *Maloney;* 85 Mont. 138, 277 Pac. 961.)

The shares of stock which the defendant is alleged to have stolen were in two certificates,—one for 63,750 shares and the other for 55,000 shares. There is no controversy as to the value of the property; it is not urged that there was any failure of proof on that score.

It appears that the Wilmont-Madison Company was incorporated in May, 1927, by Rupert Garrison and John Dullenty, residents of Madison county, Montana, and G. F. Messer, a resident of Aberdeen, Washington. The principal object of the company was to engage in quartz and placer mining. The articles of incorporation state the capital stock to be $125,000,

consisting of 500,000 shares of the par value of 25 cents each, which had been subscribed to this extent: Garrison 63,750 shares, Dullenty 127,500 shares, Messer 63,750 shares. It appears to have been the understanding between Garrison and Dullenty (who were the original projectors of the enterprise and who before Messer came along were to be equal owners therein), and Messer, that Messer should have the 63,750 shares of stock upon the agreement that he should finance the company and render to it certain services.

In April, 1928, the defendant acting for stockholders residing on the Pacific Coast, visited Garrison, then president and general manager of the company, at Virginia City and discussed the state of the company's affairs with him. Being unable to visit the company's properties because of snow in the mountains at that time, defendant went away, returning in June, 1928. Upon this visit he seems to have become greatly impressed with the value of the mining claims and other property held by the company. It appears that Messer was no longer on good terms with his fellow-directors, and an investigation of Messer's conduct was discussed. Having represented himself to be an expert accountant, defendant by resolution passed at a special meeting held July 23, 1928, was authorized to make a complete audit of the company's books. He thereupon made an audit which covered the periods from May, 1927, to July 31, 1928. About August 3, 1928, he became a stockholder to the extent of 1,000 shares and was elected president of the company. At a special meeting of the directors on September 26, 1928, defendant presided. The minutes of this meeting refer to the audit, stating that "it was evidenced through said audit" that Messer had failed to properly account for $3,046.23 of the funds of the company and had appropriated the same to his own use. It was further recited that Messer had received 63,750 shares of the capital stock of the company in consideration of services which he had promised to render to the company and that he had totally failed to render the same, to the company's great damage. Thereupon a motion was passed unanimously that the audit be

approved, that Messer be required to pay into the treasury of the company the sum aforesaid, and to return into the treasury 63,750 shares of stock, and that he be ordered to resign as director. Defendant was "authorized and empowered to take such lawful and legal action as he should deem best to enforce the demands above mentioned." Next defendant was elected fiscal agent of the company with a salary of $250 per month and expenses.

In good time defendant caused suit to be instituted against Messer. Upon trial the suit failed. But as the result of a conference between Garrison and Messer, the latter, with the understanding that he should not be "prosecuted" further, indorsed the certificate of 63,750 shares in blank and delivered it to Garrison with the stipulation that he should deliver it to the company. Garrison then gave the certificate to defendant who, on March 18, 1929, issued a new certificate in like amount in the name of Garrison, who immediately indorsed it in blank and delivered it to defendant as president and fiscal agent of the company. Defendant then had with him a large number of certificates which had been signed by ·Julian A. Knight, the secretary of the company, for use by defendant who, as fiscal agent, was to sell stock on the Pacific Coast. Garrison says he turned over the Messer stock to defendant with the understanding that it was to be returned to the treasury. Defendant says it was turned over to him by Garrison with the understanding that he was to take Messer's place, but this contention is denied by the minutes of the meeting of September 26, 1928, wherein it was stated over defendant's signature that the Messer stock was to be returned to the treasury. Instead of sending the certificate to the home office in Montana, or to the secretary at Twin Bridges, defendant kept it in his possession until October 7, 1929, when, then being in Seattle, he filled out the assignment form, which appears above the signature of Garrison on the back of the certificate, in his own favor, and issued a new certificate in his own name. The new certificate is No. 452.

A week after the issuance of certificate No. 452 to himself defendant sent out notices for an annual stockholders' meeting to be held at Virginia City on October 26, 1929, at 10 o'clock in the morning, and for a special stockholders' meeting to be held there on the same day at 2 o'clock in the afternoon. With certificate 452 and proxies defendant was in a position to vote the majority of the issued stock.

The notice for the annual meeting of the stockholders, signed by defendant as president, specified that the business of the meeting would be the election of nine directors for the ensuing year and the transaction of all such other business as might legally come before the meeting, including the approval and ratification of all actions of the board of directors and of the executive committee since the last annual meeting, and stating that the books for the transfer of stock would be closed at 3 o'clock P. M. on October 21. In a postscript the stockholders were notified that the organization of the board of directors for the election of officers would be deferrred until a meeting of the board be held at Aberdeen, Washington, because it was the desire of the stockholders' committee to elect the majority of the directors from amongst the company's financial supporters on the Pacific Coast.

The business to be transacted at the special meeting was to vote upon a proposed change in the name of the company, to vote upon a proposed change of the principal office of the company from Virginia City to Butte, to vote upon "the proposed change in number of directors from that of seven to that of nine," to vote upon a proposed increase of the capitalization and to repeal the existing by-laws and to adopt new ones. This notice, too, was signed by defendant.

On the morning of October 26 at 10 o'clock, Garrison, the general manager, and Knight, the secretary of the company, were in Virginia City to attend the meeting, but defendant was not there. He was at the company's property which is near the head of Alder Gulch, being a mile or two above the old town of Summit, and eight or nine miles from Virginia City. Garrison and Knight immediately proceeded thereto,

arriving there at 11 A. M. Defendant was not to be found. Dullenty, the largest stockholder, was there and he told Garrison and Knight that defendant and those who had accompanied him were "off in the timber somewhere." Dullenty had not been present at any meeting; did not know of any meeting. Knight and Garrison first saw defendant about noon; he said the annual meeting had been held; that Knight and Garrison were too late.

Knight, as secretary of the company, demanded the possession of the books but defendant refused to let him have them. (Some eight or nine months prior to that time Knight had sent the company's books to defendant at Aberdeen for use in the suit against Messer and defendant had retained the books although Knight had made efforts to get them.) Knight then told defendant the meeting he was planning for the afternoon would be illegal for the reason that they, meaning defendant and his party, did not have the requisite two-thirds of the issued stock, and read to defendant the statute on the subject. In the conversation Knight asked defendant if he had voted the Messer stock at the morning meeting, to which defendant answered that he had.

The state introduced in evidence certificate No. 493, which purports to show that defendant became the owner of 55,000 shares of the capital stock of the company on October 19, 1929. Defendant testified that he had purchased that stock by executing to the company a promissory note for $13,750, dated at Seattle, Washington, October 19, 1929, payable to the company "at their Seattle office" six months after date without interest. These notations appear on the note: "For purchase 55,000 shares of stock. Secured by 63,750 shares and 1,000 shares now possessed." The company did not have any Seattle office. Defendant retained the note in his own possession. It is notable that the stubs in the stock book for all the other certificates bear revenue stamps or else account for the absence thereof, but the stub for certificate 493 does not bear stamps nor account for the want of the same.

Counsel for the state take the position that after Mr. Knight informed the defendant that he could not proceed legally with the actions contemplated to be taken at the afternoon meeting, because defendant and his associates did not have control of two-thirds of the entire capital stock of the corporation outstanding and entitled to vote (secs. 5922, 5923, Rev. Codes 1921), and had read defendant the statutes upon the subject, defendant, between the morning meeting and the afternoon meeting, on October 26, issued to himself certificate 493, and then and there executed the note.

Without discussing the evidence in detail, it must be admitted that the circumstances shown lend support to the argument. In this connection the figures on pages 81 and 83 of the minute-book, made by defendant, are informative and significant. Defendant says all the figures on page 81 were made in Seattle. Whether this is true is questionable. It appears that defendant started upon the hypothesis that 385,560 shares of the capital stock had been issued; by virtue of stock standing in his own name (including the Messer stock), proxies, and 9,600 shares held by his friends who attended the meeting, defendant controlled 242,320 shares. He had, then, a majority, but not two-thirds. The figures on page 81 disclose a series of experiments to ascertain how much stock it would take to make up the desired two-thirds. Eventually, defendant ascertained that the addition of 55,000 shares would give him 67 per cent. He then changed the original figures indicating the amount of stock he was entitled to vote at the meeting which he had set down as 84,750 to 139,750. He changed "Total issue" from 385,560 to 440,560, and "Present at meeting" from 242,320 to 297,320. In each case it will be observed he added 55,000 to the original figures. Did he make these changes after the morning meeting? There is reason to believe he did.

The minutes of the morning meeting, wholly in defendant's handwriting, show that there were present, defendant, D. Finch, Grant Gurrad, John W. Finch and E. G. Lehman. Defendant was made chairman of the meeting and Lehman

secretary. It was recited "as a matter of record following officials have not reported for attendance at this meeting: Rupert Garrison, Julian Knight, Frank Wright, John Dullenty," and a resolution was adopted looking to their removal from office. Defendant assumed to read a secretary's report, prepared by himself, "in absence of the secretary incumbent of office prior to this meeting," and also a treasurer's report, prepared by himself, "in absence of the treasurer incumbent prior to this meeting." Garrison was censured and "dismissed from any affiliations with this company." Other actions not favorable to Garrison as well as Dullenty were taken. Nine directors were elected but none of the former directors were included except defendant. By another resolution the defendant was given practically complete control of the company.

Especially notable is this item: "Be it resolved that the former holdings of G. F. Messer for 63,760 shares of the common stock as acquired and assigned by Rupert Garrison and now in possession of Wm. E. Letterman be approved and accepted as his personal holdings. Motion—seconded—carried." Being asked to explain why, if he became the owner of the Messer stock by arrangement with Garrison in March, 1929, he saw fit to have this resolution adopted, defendant explained: "I always in the conduct of my office I have my acts throughout my administration up at the close ratified as a board of directors or as any company does. And that is my explanation of that." Asked why he did not use the phrase "now owned by Wm. E. Letterman" rather than "now in possession of Wm. E. Letterman," he quibbled, failed to give a reasonable explanation.

In the afternoon of October 26, 1929, Knight as secretary commenced an action in claim and delivery to obtain possession of the books. Toward evening the sheriff, setting out to serve the papers, met the defendant, then on his way to Butte, a short distance from Virginia City. When the sheriff demanded the books, defendant said, as the sheriff understood it, that the books were in Butte. Defendant's version is that he told the sheriff the books were "ahead." As a matter of

fact, the books were at the company's bunkhouse above Summit. In another action brought by Garrison, Knight, Dullenty and Wright, it was adjudged that no meeting of the stockholders of the company was held on October 26, 1929, the pretended meeting was held void, and the minutes of the meeting were canceled. Defendant did not make any defense to either action.

That defendant conceived a plan to oust Dullenty, Garrison and Knight from the control of the company and to make use of the company for his own benefit, there is little, if any, doubt. The evidence warranted the jury in believing, beyond a reasonable doubt, that in furtherance of that plan, he, being the custodian of 63,750 shares of stock belonging to the company, and knowing that he had no legal right to do so, converted the stock to his own use; that he did so with the felonious intent of depriving the company thereof. Whether as much can be said with reference to the 55,000 shares of stock for which defendant issued certificate 493, it is not necessary to inquire, the offense charged against him being proved with respect to the 63,750 shares. Defendant had in his possession at the meeting on October 26 certificate No. 452 for 63,750 shares and voted the stock thereat; whether certificate No. 493, for 55,000 shares, was issued at Seattle or in Madison county, he also had that certificate in his possession at the meeting and then and there voted the stock represented thereby. In passing: we have not overlooked the possible application of the provisions of section 11438, Revised Codes 1921, to the issuance of certificate No. 493. That section, relating to the fraudulent issuance of corporate stock, was not called to the attention of the lower court by counsel on either side, nor was it referred to in the argument in this court. The case was tried upon the question whether the defendant was guilty of larceny as that crime is defined in section 11368, the substance of which the court gave to the jury.

The instructions, given with the concurrence of the defendant, are the law of the case.

Shares of stock are property and the subject of larceny. ██ (*People* v. *Williams*, 60 Cal. 1; 2 Bishop on Criminal Law, 8th ed., sec. 357.) Certificates of stock as subjects of larceny are specifically mentioned in section 11860, Rev. Codes 1921. (See *People* v. *Kirwin*, 87 Cal. App. 783, 262 Pac. 803.) The shares of stock, however, constitute the property, a certificate being only the evidence of the property. But as title to the property may be transferred by the certificate, the certificate is the subject of larceny. (Sec. 11860, supra; 5 Fletcher on Corporations, sec. 3426, note 93; *Wood* v. *Commonwealth*, 229 Ky. 459, 17 S. W. (2d) 443.) The distinction between the stock and the certificate which is evidence of title to the stock is largely artificial. (*Simpson* v. *Jersey City Contracting Co.*, 165 N. Y. 193, 56 L. R. A. 796, 58 N. E. 896; *Wood* v. *Commonwealth*, supra.)

Counsel for defendant argues that defendant exercised ownership over the property which he is charged with stealing, openly and under a claim of title preferred in good faith, and therefore under the very terms of the statute (sec. 11384, Rev. Codes 1921) he is not guilty. But all this was submitted to the jury, which found against defendant. The jury did not credit the argument that defendant acted in good faith. He did not appear "armed so strong in honesty" as to incline the jury to give his explanations weight. A casual reading of his testimony discloses that he must have made a very unfavorable impression upon the jury; a careful analysis but confirms that conclusion. Defendant, always voluble, was evasive at critical points on cross-examination. His demeanor must have counted against him. As to the superior advantage of the jury in weighing testimony we need not repeat what was said in *Labbitt* v. *Bunston*, 84 Mont. 597, 277 Pac. 620.

Able counsel for the defendant has argued earnestly that his client did not have a fair trial and that the evidence does not sustain the verdict. The trial judge was very careful in preserving the defendant's rights. As has been said, there is substantial evidence in the record to sustain the verdict. It is fair to say that the counsel who appeared in this court did

not take part in the trial below. The eggs were scrambled before he was called into the kitchen.

The judgment is affirmed.

ASSOCIATE JUSTICES FORD and ANGSTMAN concur.

ASSOCIATE JUSTICES MATTHEWS and GALEN, being absent, did not hear the argument and take no part in the foregoing opinion.