## Palmer et al. v. Commonwealth.

(Decided June 19, 1931.)

(As Modified on Denial of Rehearing Oct. 6, 1931.)

J. W. S. KISER and C. C. BAGBY for appellants.

J. W. CAMMACK, Attorney General, and SAMUEL B. KIRBY, JR., Assistent Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

For the crime of setting up, managing, operating, or conducting a game of oontz or craps for compensation, section 1960, of the Statutes, provides a maximum punishment of imprisonment in the penitentiary for three years and a fine of $500, the judgment carrying with it the stigma of infamy and disqualification forever from exercising the right of suffrage and from holding any public office of honor, trust, or profit. The appellants, Phil Palmer and J. Hugh Dykes, have been convicted of that crime and adjudged to pay the maximum penalty. This fact accentuates the plea for a most careful consideration of the several grounds for a reversal which are submitted and argued by the able counsel for the appellants and the appellee.

On analysis of section 1960, of the Statutes, it is divisible into three parts or found to have a threefold object. First, it condemns the operation of gambling machines and contrivances, with the element of compensation explicitly eliminated. Second, it condemns the setting up and conducting of gambling, card, and crap games for compensation or percentage or commission. Third, it condemns the aiding, assisting, or abetting, with or without compensation, of any game so set up or conducted. Section 1967, of the Statutes, prohibits the suffering or permitting of gambling by any one in any of the forms condemned. It was intended to reach and punish in milder form a class of offenders not embraced in the former section. Herr v. Commonwealth, 91 S. W. 666, 21 Ky. Law Rep. 1131. Section 1978 is quite similar and is all embracing in its terms.

It is contended that the indictment, at least as to Palmer, was demurrable, and that the evidence is not sufficient to support the verdict. Both points rest upon the ground that the accused were neither charged nor proven to have conducted the crap game for compensation, and that, if guilty of any offense at all, it was of the misdemeanor denounced by section 1967.

The indictment directly, certainly, and sufficiently charges and accuses Palmer of the crime of "carrying on and managing, operating, and conducting for compensation a game of craps and a game of chance in which money and property was bet, lost and won." Similarly, it accuses Dykes of the crime of "aiding, abetting and assisting said Palmer therein." The description is that Palmer, on the 6th and 7th days of April, 1931, in a certain room did "set up, carry on, manage, operate and conduct a crap game and game of chance in which money and property of value was bet, lost and won and where gambling was engaged in for compensation and said J. Hugh Dykes was then and there the person unlawfully, willfully and feloniously aiding, assisting and abetting said Palmer in setting up, carrying on and managing said game of craps and chance by keeping the door therefor and receiving compensation and pay for admission to said room and participation in said game, and engaged with said Palmer in the carrying on and operating said game."

It is argued that the charge is only that Palmer set up, etc., the game, and that it was the gambling which was for compensation and not the operation of the game. This, it is said, is made certain by the latter part of the instrument which accuses Dykes alone with having received compensation or pay for the privilege of admission and participation in the game. The word "compensation," as it relates to Palmer, is simply placed out of its proper order. Other reasoning, it seems to us, to be attenuate and technical. There was little or no attempt at punctuation of the sentence and undoubtedly the word relates to the operation of the game. It would be an unusual statement that one gambled for compensation, but not unusual to say that one operated a game for compensation. The strict and technical constructions of an indictment which prevailed in former days have been superseded by a more sensible practice, through the application of the rule of common understanding. Criminal Code of Practice, sec. 122. As thus gauged, the indictment is sufficient.

The appellant, Palmer, resided in Lexington, and in January, 1931, rented a suite of three or four rooms over a poolroom on the main street of Danville. He placed in them a dining room table and covered it with a piece of cloth taken from a pool table. A number of chairs accompanied it. With the exception of a means of heat-

ing the rooms, this was all the furniture in the suite until perhaps the early part of April when a cot was put in. Palmer testified that he proposed opening a tailor shop in Danville, but could find no vacant room, and that he rented these rooms for living quarters. However, he stated, his wife shortly thereafter was injured in an automobile accident, and they could not move there. Although having no business requiring his presence in Danville, it is shown that he was there pretty continuously. The proof of the commonwealth was that he usually stayed at a hotel, but he claimed that he stayed in this apartment. It was shown that there were several business houses available for a tailor shop, and it is not shown that Palmer ever undertook to rent any of them.

The evidence of several young men tends to prove that there was a crap game in this room every night, the stakes varying from 50 cents to $50. The dice used were usually found there on the table. Dykes appears simply as an assistant. He had a key to the room and paid over the collections to Palmer. One of the two men was always present; sometimes both of them. They often participated in the crap shooting. As the other participants entered the rooms, or sometimes after beginning to play, each paid $1 either to Palmer or to Dykes for the privilege of playing. Spectators were not charged anything. One witness testified to having been informed by Palmer that he rented some rooms to live in later, but that he was having a little game up there once in awhile and impliedly invited him to come up. He did so and Palmer asked him for $1 with which to pay rent, lights, etc. The proof is that on the night of April 6th a game of craps was in progress with a number of young men playing. Dykes collected the admission fees that night. On this particular night Dykes broke up the game in order to get rid of one player, Craig Johnson, who had lost and raised a disturbance. Word seems to have been passed around, however, and the others returned to the gambling. Johnson also came back. Some time before 2 o'clock in the morning Palmer came in. The game was in progress and after a few minutes the crowd was again dispersed, Palmer saying it was because of boisterous conduct.

The defense was that the accused had not set up or operated any crap game or other game of chance within the meaning of the felony statute, but had merely permitted the boys to play in his room in a free-for-all

game. The dollar was collected from the players only to pay the rent and light bill and not to compensate him. The rent was only $35 and the light bill was about $2 a month. The collections were greatly in excess of those sums.

It is further argued that since at the time covered by the indictment Palmer was absent until a few minutes before the game broke up, and there was no evidence that he personally received any compensation for the use of his rooms and furniture on the particular occasion, he should not have been convicted. It is not denied that Dykes received money from the participants that night during Palmer's absence. The evidence clearly proves a course of conduct and agency of Dykes of a character that justifies the reasonable conclusion of Palmer's guilt. It must not be forgotten that he who does an act by the hands of another stands in law just as if he had done the act himself; that the commission of a crime may be through the instrumentality of an agent acting directly under the principal's commands or in the course of his employment and with his knowledge or consent. Roberson's Criminal Law, sec. 195; Cartwright v. Commonwealth, 196 Ky. 6. 244 S. W. 55; Fields v. Commonwealth, 202 Ky. 523, 260 S. W. 343; Wood v. Commonwealth, 229 Ky. 459, 17 S. W. (2d) 443.

The World War brought us the new expressive word of "camouflage," universally understood to mean the art of disguising or concealing the nature of objects and operations. It reached a high degree of perfection in many instances, but the appellants signally failed in their attempt to camouflage their operations. To say they were not conducting or operating the game, and that Palmer did not do so for compensation, even on the specified night, would put a strain on the credulity of any reasonable man. Nor can their technical claim be sustained that, since neither received a "take out," or a portion of the sums gambled for, they did not come within the denunciations of the statute and of its expressed purpose to suppress gambling. At common law, unless the element of public nuisance was involved, gaming was not regarded as an offense. It has been made so by statute in England and in this country. But the keeping of a common gambling house was indictable at common law, and it is everywhere regarded as a serious offense to lure men into games of hazard and chance, the pernicious effects of which are so generally

recognized. Our statutes are numerous and strict as they pertain to this crime and manifest a most positive legislative intent to suppress it. Hence, they must be interpreted quite liberally for the purpose of fixing responsibility upon him who thus debauches men, young or old.

It is submitted the evidence tends to prove only that Palmer violated the provisions of section 1967 relating to the suffering of gaming on premises under his control and was subject only to a fine, since he did not get a "take out" or part of the stakes. The word "compensation," as used in this statute, is very comprehensive and means a consideration or remuneration in any form whatsoever. Harper v. Commonwealth, 93 Ky. 290, 19 S. W. 737, 14 Ky. Law Rep. 163. In that case the accused submitted a similar claim for an acquittal. A room was fitted up as a gambling room and persons resorted there to play, just as they did here. Harper assumed something of a manager of the games and there was a sum taken out for the purpose of paying for drinks, cigars, lights, and cards.

We quote this applicable excerpt from that opinion:

"But it does not directly appear that the appellant received the take-out as compensation that might remain after the payment of these expenses or commission. But we think that the jury had a right to infer from the fact proven that he did receive compensation or commission, for it is not at all probable, but highly improbable, that the appellant, not being an idiot or feeble-minded, would devote his time to running that game, as it was run, for mere pastime or accommodation; but the jury had the right to infer that he received compensation, reward, or commission in some form."

Again, the length of this additional quotation will be excused, we trust, because of its pertinency and timely interest:

"It is the duty of the commonwealth to promote and protect the peace and good order and happiness of its citizens, by enacting adequate laws for the punishment of vice and crime, and to prevent any practices that lead to vice and crime. There is no doubt that gambling is a great social and moral evil that leads to crime and dissipation, and wrecks

fortunes, and brings poverty and misery upon the helpless and the innocent; and it is certainly not only the duty of the commonwealth to enact such penalties against the gamblers themselves as will deter them, but to enact such penalties against such persons as hire themselves out to set up and carry on the gambling hells. And if it requires confinement in the penitentiary and disfranchisement to prevent or check the practice, the legislature has the constitutional right, and it is its duty, to enact such a law. That body is necessarily the judge of the adequacy of the penalty necessary to prevent the crime. The court has no right to say that the punshment is cruel and unconstitutional, unless it clearly manifestly so appears, which we cannot do in this case. On the contrary, we think the legislature was clearly within the exercise of its constitutional power in enacting the law.''

The evidence was ample to sustain the verdict of the jury.

The instructions followed the language of the indictment, and the criticisms of the first one, under which the defendants were convicted, cannot be sustained for the reasons indicated. Whether it was proper under the indictment to give an instruction covering the misdemeanor condemned by section 1967, we need not determine, for if it was improperly given it was obviously not prejudicial to the accused.

The appellants moved for a continuance of their trial upon the ground that there was an inflamed condition of the public mind growing out of a recent homicide and because the judge had prejudiced their chances for a fair trial by reason of a speech made or instructions given to both the grand and petit juries concerning the evils of gambling, and in effect saying that a recent homicide in Danville was the result of drinking and gambling in and around the city. The entire charge, stenographically reported, was submitted, together with affidavits, in support of their motion. After hearing evidence as to the state of public feeling and the effect of his statements, the court overruled the motion. This address was also relied on as a ground for a new trial or rather as the basis of the ground that it was error not to have discharged the jury panel because of it.

As an apologia, the judge prefaced his remarks by saying that he had established the custom of endeavoring to impress upon jurors or those summoned for that service an appreciation of their obligations to the government and their duties as citizens. He then launched into an eloquent and forceful denunciation of crime and of the laxity of enforcement of criminal laws, leading to disrespect for them. Reference was made in a general way to local conditions, particularizing violations of the gambling and liquor laws, and condemning an apparent condonation on the part of many otherwise good citizens. The judge referred to the fact that there had been four murders in Danville in the last four years, and that the greatest instrumentality in causing them was the violation of the prohibition laws. Special emphasis was laid upon clubs and club influences tending towards evil and the obstruction of public justice by reason of so-called "gentlemen's agreements" not to testify against one another. He appealed to those whom he was addressing in dramatic language to see to it that protection was afforded the law-abiding citizens. Umbrage is especially expressed by the appellants to the reference to "the blood-stained streets of Danville," and to a certain nationally notorious criminal who it appears is an Italian, of which extraction Palmer is, although born in New Jersey; also to club influences as being an indirect reference to appellants' operations.

It is said in brief, but not in the record, that a homicide took place in the rooms of appellants on the night covered by the indictment, and it is argued that the address of the court was bound to have affected their rights by inciting public opinion and influencing prospective jurors against them. It is sought to apply to the facts the rules laid down in Shaw v. Commonwealth, 206 Ky. 781, 268, S. W. 550; and Miller v. Commonwealth, 225 Ky. 744, 9 S. W. (2d) 1088. The cases, we think, are to be distinguished on the facts.

In both of them the statements implied that the defendant and his witnesses were not worthy of belief and tended to discredit their respective defenses. The language of the judge in this case, construed by counsel as relating to these defendants, was the converse; that is, that through club influences or the fellowship of participants in gambling, there arose gentlemen's agreements not to testify one against the other. The inference

to be gathered was to discredit witnesses for the prosecution and not the defense.

There was no particularizing of the appellants, nor of the crime with which they were charged. Nor was there any direct reference to the homicide alluded to. Offenses were condemned—not these offenders. Crime, indeed, is running wild; punishment is only walking, and that lamely. The courts, surely, must rigorously maintain the standards of the law and may emphasize the duty of citizenship. This does not mean that a judge may become a prosecutor nor assume other than that of an impartial attitude between the prosecution and the defense. There is nothing in this record which tends to show that the distinguished judge who tried the case did not accord to the accused their every legal right. But to address prospective trial jurors is a practice fraught with danger, especially when reference is made directly or by innuendo to particular cases which may come before them. In this case the court made full inquiry as to the state of mind of the community, and permitted full interrogation of the members of the panel as to their attitude toward the matters referred to and to the possible effect of the court's statements and the consideration which they would or would not give to what they had heard.

We are admonished that our power to reverse a judgment of conviction is restricted to errors which appear to have been prejudicial to the substantial rights of the accused. Criminal Code of Practice, sec. 353. A full consideration of the subject matter of the trial court's address does not make it appear that such an error was committed in relation to it.

We have given careful consideration to the able arguments made in behalf of the appellants, but reach the conclusion that they did have a fair and impartial trial.

Wherefore the judgment is affirmed.

Whole court sitting.